## Case No. 16,768.

### UNITED STATES v. The WREN.

[27 Law Reporter, 267.]

District Court, S. D. Florida. 1865.[1]

PRIZE—ENEMY'S VESSEL—CONFEDERATE OFFICER IN COMMAND—EVIDENCE—RIGHT OF SEARCH—TERMINATION OF HOSTILITIES.

[1. The carrying of military or naval persons in the service of the enemy to enemy ports subjects the offending vessel to condemnation.]

[2. The captured vessel was commanded by a Confederate naval officer, who had been frequently employed in purchasing vessels for the Confederacy. There were no instructions for the voyage on board, but previous to the capture there had been a flagrant destruction of papers, and the vessel contained a Confederate flag. The master was directed to deliver the vessel, not to the asserted owner, but to other persons, and he had in his possession an order, payable on delivery of the vessel in Liverpool, which was signed by the agent of the Confederacy at Havana, who, it was claimed, was also the agent of the owners, but no claim for the vessel was made by such alleged owners or such agent. Held, that a condemnation was justified.]

[3. In time of peace the naval vessels of one nation have no right, except under treaty stipulations, to search or visit the vessels of another nation.]

[4. Where, though no right of search exists, a seizure is made, and it turns out that the vessel has no right to the flag under which she was sailing, the nation to whom such flag belongs has no ground of complaint.]

[5. So long as the cruisers of an expired rebellion are still recognized as in any respect entitled to the privileges of national vessels of war, the claimants of vessels captured as belonging to the rebel organization cannot argue that the state of war has ceased to exist, especially when the captured vessels are sailing under the flag of a nation which at the date of capture continues to recognize a state of war as existing.]

[6. The liability of the captured vessel to condemnation is not affected by the right of the captors to prize money.]

[7. Nor is it affected by the fact that the capture was brought about by a revolt of the crew.]

In admiralty.

BOYNTON, District Judge. This vessel sailed in ballast from Havana, for Halifax and Liverpool, on the 12th day of June, 1865; on the morning of the 13th, before daylight, she was seized by a part of her crew; on the evening of the 13th she was brought into Key West, and delivered to the authorities. She has been libelled as prize, and claimed by the master as the property of John Laird, a British subject. The case has been heard upon the testimony taken in preparatorio, and further proof directed to be taken by the court. It is not pretended by the captors that the asserted voyage which the vessel was pursuing at the time of seizure was not the real one, nor that it was an unlawful one. Condemnation is sought on the ground of enemy ownership.

It is obvious that, beyond the important questions which come up in all prize cases, there are here exceptional ones, arising out of the time of the capture, and the manner of the capture. The vessel was seized after the enemy organization within the United States, which had waged the war, had ceased, or almost ceased to exist. The seizure was made at this time by a revolt of the crew, who had shipped and signed articles for a voyage from Havana to Liverpool. Perhaps clearness will be promoted by examining these questions separately.

The register of the vessel, dated Dec. 24, 1864, names as the owner, "John Laird, the younger, of Birkenhead, in the county of Chester, ship builder," and as the builders, "Messrs. Laird Brothers, Birkenhead," and states that she was built in 1864. The master testifies that the vessel "belonged to Laird, junior, of Liverpool, as he inferred from the register, and was informed," and "that he only knows the fact from the register." The chief officer, Jas. C. Long, states that he does not know anything about the ownership of the vessel. The purser, Mr. T. R. McGahan, says that he believes the vessel

---

[1][Reversed in 6 Wall. (73 U. S.) 582.]

belongs to Frazer, Trenholm & Co., of Liverpool, but has no personal knowledge; "that he has heard Major Helm at Havana, and Mr. Lafitte also at Havana, speak of Frazer, Trenholm & Co. as the owners of the vessel." John Duggen, the third officer, says "that he has been in the vessel since she left Liverpool; that he believes the vessel belonged to the Confederate government; that he had heard Captain Moore, her former master, say that she was Confederate government property; that she had a Confederate flag on board, which was frequently hoisted in the harbor of Havana; and that she displayed the Confederate flag on her flag-staff abaft in the harbor of Galveston, in the manner usually displayed by national vessels." These four witnesses were the only ones examined in preparatorio by the prize commissioner. A motion was made by the claimant to strike out the deposition of Duggen on the ground of his identity with a name signed to a letter sent by the captors to the admiral and by him forwarded to the prize commissioner, to which were attached ten names, all in one hand-writing, among them that of "Dugan." The court refused the motion, but in the order for further proof framed an interrogatory calling for the names of all the persons engaged in the seizure, under which all the persons in the ship might have been examined by either party on this point. Three of the captors were examined; they all give the names of all the persons whom they aver to have been engaged in the undertaking, and do not name Duggen. The master says, in answer to this question, "that the third officer, John Duggen, was on the bridge at the time and in charge of the watch, and he believes him to be one of the principal persons engaged in the mutiny." The purser, Mr. McGahan, says, that "from the conduct of a man called Hamilton and one called Harwood, and the carpenter and the third officer, Duggen, subsequent to the seizure, he believes they had knowledge of the undertaking before its commencement." These are the only witnesses who name Duggen. He was himself not examined by either party.

On his first examination upon the standing interrogatories, the master stated that he was appointed to the command of the steamer by Mr. Ramsay, of Havana; that there was no charter party; he was engaged to take the vessel to Liverpool, and deliver her there to Frazer, Trenholm & Co.; that all the papers on board were taken by the asserted captors, except two papers which were destroyed; and that he has known the vessel, on former voyages, to sail from and to the port of Galveston, Texas,—one of the blockaded ports under the forces of the United States; and that there was a Confederate flag on board,—that he does not know for what reason it was on board; he did not bring it on board, nor want it on board.

Mr. McGahan, the purser, states, "that he

was born in South Carolina, and owes allegiance to that state; that the master was appointed to the command, as he understood, by Major Helm, at Havana; that the vessel had been trading to Galveston; that he destroyed three papers handed to him by the master after the arrival of the vessel at Key West; he was instructed to destroy them; he does not know their contents; he was told by the master that one of the papers was the instructions for the voyage. One of the papers, which was open, was in the handwriting of, and signed by, Charles J. Helm;" and that "he believes the real and true property of the vessel is in Frazer, Trenholm & Co." In answer to the further interrogatories propounded by the court, the same witness says. "that at the time of leaving Havana, deponent believed Major Charles J. Helm appointed Captain Stiles to the command; he arrived at that conclusion from hearing Major Helm speak of the resignation of the former master, Captain Moore, and of the vessel being about to go to England; he believes that Major Helm had control of the steamer. Deponent desires to add that since the arrival of the 'Wren' at Key West, he has heard Captain Stiles say that he (Stiles) was appointed by Mr. Ramsay, which he believes to be the fact." "That he believes Major Helm acted in the capacity of agent for Frazer, Trenholm & Co. in making the appointment of Captain Stiles to the 'Wren' as master, if he made it at all; has heard Major Helm say he was the agent of Frazer, Trenholm & Co., for the 'Wren' and other steamers at Havana; heard Major Helm make this remark in connection with a claim made by Addison Cormack for a debt asserted to be due to him from the Confederate States, for which he threatened to attach the 'Owl.'" To the fifth interrogatory he answers, "that he does not know who appointed Captain Stiles to the command; has already said that he believes the appointment was made by Major Helm. Previous to the time of the appointment of Captain Stiles, and witness believes also at the time of the appointment, Major Helm was regarded as the Confederate agent appointed by the government at Richmond. He has no knowledge of his having acted in any public capacity, but has heard him say that by the terms of his appointment he was not constrained to reside in Havana, but might reside anywhere else in the Island of Cuba; from this conversation deponent inferred that Major Helm was residing in Cuba by appointment of the Confederate government, in a public capacity."

Charles J. Helm is repeatedly spoken of in the mass of letters and papers found on board the "Wren," and returned by the prize commissioner, as "C. S. Agent at Havana," and he has been little less widely known in that capacity during the past four years than Mr. Davis, Mr. Mallory, and Mr. Trenholm have in the positions they have held.

In his second examination the master ad-

heres to his statement that he was appointed to the command of the vessel by C. G. Ramsay. Though the case had then been once argued, and condemnation demanded on the ground of enemy ownership, the master says, in answer to the question, "in what capacity and by what authority the person who appointed him to the command acted," "that he acted in the capacity of agent for the 'Wren' at Havana," and that his means of information in regard to Mr. Ramsay being the agent for the "Wren," at Havana, is derived from the fact that Mr. Ramsay gave him a letter to the British consul to consider deponent as the master of the "Wren," and that he has no other means of information on the subject. He does not say that Mr. Ramsay acted in the capacity of agent for Mr. Laird, the asserted owner, or for Frazer, Trenholm & Co., to whom he was to deliver the vessel, but that he acted in the capacity of agent for the "Wren," which is sufficiently indefinite, certainly. The chief officer, Mr. James C. Long, says on both examinations that he believes the master was appointed to the command by Mr. Ramsay.

It is worthy of note that in his first examination the master, speaking of the two papers which he says were destroyed, says one of them was "a letter to himself from the office of the agent of the vessel, Mr. Helm, at Havana," and the other, "an order in favor of deponent from Mr. Helm for the payment of forty pounds, payable on delivery of the ship at Liverpool." A letter dated Head-Quarters, district of Texas, New Mexico, and Arizona, office chief of artillery, Houston, May 10, 1865, addressed to "Commander Stiles, C. S. Navy, care C. S. agent, Havana, Cuba," and signed "G. V. Magruder, Jr.," says:

"My dear Captain, I am quite in despair about the condition of the Blakely guns recently sent on the 'Wren.' As usual, they came in unserviceable condition; the carriages have been left in Havana. I have written to Major Helm on this subject, as well as about the ammunition for the Whitworth guns, which should have been sent by the 'Wren.' I will consider it a great favor if you will impress upon Major Helm the great importance of getting in these stores without loss of time, as we may be obliged to abandon Galveston at any moment."

Another letter is as follows:

"Houston, April 5, 1865. Capt. Moore, S. S. Wren, Galveston: Sir,—Mr. John Williams will with this make known the object of his visit. Mr. Williams is desirous of visiting Havana, and applied to me for passage, but as I have made it a rule not to interfere in the management of the government ships, leave the matter entirely with you. Very respectfully, Henry Sampson."

It cannot be denied that all this points strongly towards Confederate ownership.

There is nothing in the position or history of the master of the vessel at the time of capture to prevent this conclusion. Captain Stiles swears that he was born in Pennsylvania; he appears by the papers captured and returned, to have been for a considerable number of years an officer in the navy of the United States; in 1856 he was appointed United States consul at Vienna which position he held until about the spring of 1862.

The day on which he entered the Confederate service does not appear; but a book of letters and memoranda relating to the steamship "Cornubia" contains copies of the following letter and receipt:

"St. George's, Bermuda, December 9, 1862. Captain John Burroughs, Steamer 'Cornubia': Sir,—In reply to yours of yesterday, informing me that the steamer 'Cornubia' is coaled, stored, and ready to take in cargo, and that you have procured a crew to proceed in her, agreeing with them that in case of capture or loss of steamer they are to be sent to England at the expense of the Confederate government, and their wages paid up to the time of arrival in Great Britain, I have to state, that as soon as you can hand me inventory of stores, furniture, fixtures, &c., now on board of her, together with the list of articles sent out of her since her arrival in this port, that I am ready to receive the ship in the name of the Confederate States government, and to give you a triplicate receipt as agreed upon before leaving England. * * * [Signed,] Edwd. C. Stiles."

"Port St. George's, Bermuda, December 10, 1862. Received from Thomas Sterling Begbie, Esq., of London, by the hands of Captain John Burroughs, the British steamship 'Cornubia,' complete in masts, spars, rigging, machinery, boilers, boats and all stores, appertaining to the said 'Cornubia,' as per agreement in London. [Signed,] Edward C. Stiles."

The following order indicates that later in the month of December Captain Stiles was in Richmond:

"War Department, Ordnance Bureau, Richmond, December 24, 1862. Captain,—Having been appointed by the secretary of war to carry out certain instructions from this bureau, dated Dec. 24, 1862, you are hereby assigned the pay and allowance of a captain of artillery on ordnance duty, while on duty with this bureau, in executing the functions assigned to you in said letter. Respectfully, J. Gorgas, Col., Chief of Ordnance.

"Captain E. C. Stiles, on Ordnance Duty: You will be paid at the same rate from the first of November, or from date of taking charge of steamer 'Justitia.' J. Gorgas, Col., Chief of Ordnance."

By another order from the same department and bureau, approved by Jas. A. Seddon, secretary of war, and dated the same

day, he is directed to take the steamer "Cornubia" from Wilmington to Bermuda, and then "proceed to Liverpool and London, and communicate with Major Caleb Huse, relative to the purchase of a vessel such as you and he may think suitable for the purpose of carrying freight from Bermuda and Nassua to the ports of the Confederate States."

On the 2d of March, 1863, Caleb Huse, in London, addresses a letter to Captain Stiles, in which he says:

"Having read your instructions from Colonel Gorgas, in reference to the purchase of a steamer from the C. S. government, I have the honor to inform you, that having entire confidence in your judgment, I desire you to take the whole matter of selecting a proper vessel into your own hands."

Then follows this letter:

"71 Jermyn St., London, S. W., April 14, 1863. Captain Halpin: Dear Sir,—You will be pleased to consider Capt. E. C. Stiles as the registered owner of the S. S. 'Eugenie,' and receive all commands from him from this date. You are perfectly aware of the circumstances under which I became the registered owner of the 'Eugenie,' and as it is impossible for me to give the necessary orders, I prefer that Capt. Stiles should be my legal representative. I am, dear sir, yours truly, Saul Isaac."

On the 25th of May, as appears from his letter of appointment signed by S. R. Mallory, secretary of the navy, Edward C. Stiles was appointed a "lieutenant for the war in the navy of the Confederate States," and directed to report to the secretary of war for duty. On the same day he was directed by an order approved by James A. Seddon, secretary of war, to proceed to Wilmington and take general charge of the steamer "Eugenie"; on arriving at Bermuda, to confer with Norman Walker, Esq., special agent of the war department, and to bring back the steamer "Harriet Pinckney" loaded with bacon, provisions, etc. The following letter appears to have been written a few months later:

(Copy.) "Steamer H. Pinckney, August 10, 1863. Captain F. Johns: Captain,—My letter to you dated the 24th July, ordering you to go to Halifax, is hereby annulled. You will now proceed to St. George's, take in a cargo which will be furnished you, and then proceed under my direction to such port as I may designate. Should you have any doubts as to the ownership of this vessel, as she now bears an English register and flag, I am ready to make oath as to whom she really belongs, and to make such arrangements as will clear you from all responsibility in case of the loss of said vessel. As you have recognized my orders heretofore, I trust you will continue to do so. Edward C. Stiles."

Among the papers is a copy of a receipted account, or bill, in which "the Confederate States of America" are charged for three months services of Edward C. Stiles, "as commander of S. S. 'Harriet Pinckney,'" The receipt is signed by "Edward C. Stiles, C. S. N." On the 28th of September an order of the Confederate States navy department, signed by S. R. Mallory, secretary of the navy, grants Lieut. Stiles "leave of absence for the purpose of visiting Europe in connection with purchasing vessels for the volunteer navy of Virginia." Besides these papers there are more than a hundred other letters and memoranda by and between Edward C. Stiles, the authorities at Richmond, Caleb Huse, John Slidell, and various steamboat owners and agents and other persons, chiefly relating to negotiations for the purchase of steam vessels.

The cumulative testimony in this case renders it unnecessary to inquire how far any nation can, by changing its navigation laws so as to permit its ships to be commanded by foreigners, entitle foreigners belonging to nations at war to claim its ships in prize courts in time of war. Carrying military or naval persons in the service of the enemy to enemy ports subjects the offending vessel to condemnation. The Friendship, 6 C. Rob. Adm. 420; The Orozembo, Id. 430; The Caroline, Id. 463. If war existed between Great Britain and France, it would be ludicrous to see a distinguished French marshal or admiral claiming, as master, a neutral vessel captured on a voyage to France, in an English prize court, on the ground that the neutral nation permitted its vessels to be commanded by foreigners. In this case it is not denied that the vessel was bound to Halifax and Liverpool, and it is unnecessary to inquire whether or not the considerations apply, further than as they indicate the general improbability of the selection of belligerent naval officers · to command vessels really neutral.

The evidence establishes the facts: That the vessel was captured in the possession of, and commanded by, a Confederate States naval officer; that not a word of written instructions for the voyage was on board, from the asserted owner or his agent, or any one else, unless such instructions were contained in the papers which were destroyed; that there was a flagrant destruction of papers by a master whose naval and consular education must have made him acquainted with the presumption which such conduct justifies; that there was a Confederate flag on board; that it had been for a long time the practice of the master to purchase vessels for the Confederate government, and cause them to be retained under foreign documentation; that the master was directed to deliver the vessel not to the asserted owner in Liverpool, but to other parties; that the master had an order for forty pounds, payable on delivery of the vessel in Liverpool, from a person who, whatever other positions he may have held, was certainly the Confederate States agent at Havana. In addition to this there are strong reasons for believing that the master was appointed to the command of the vessel by the same Confederate States agent; the cap-

tain himself says that one of the papers destroyed was a letter to him from the office of the agent of the vessel, Mr. Helm; and the purser says that the master told him one of the letters destroyed was the instructions for the voyage, and that he understood at Havana that Major Helm appointed the master to the command, and had charge of the vessel, in the capacity of agent for Frazer, Trenholm & Co., who, through communication with Havana, is so frequent, have not claimed, either personally or by agent. Also we have the letter from a person apparently of considerable rank in the Confederate service, in which the vessel is spoken of while at Galveston as a "government ship." This is exclusive of the testimony of Duggen, which it is not necessary to consider. When we remember that unexplained spoliation of papers alone (The Hunter, 1 Dod. 480; The Two Brothers, 1 C. Rob. Adm. 133; The Pizarro, 2 Wheat. [15 U. S.] 241) is not unfrequently accepted by prize courts as sufficient evidence to justify condemnation, we shall see that here it is impossible to hesitate, and that restitution must be denied, unless there are other features not yet considered, to necessitate it.

Though we have considered the main question from the point of view of capture in time of war, and proceedings in prize, it may be best in addressing ourselves specially to the question of the time of the capture, at first to consider it upon the hypothesis, that the state of war has entirely passed away and ceased to exist, and that peace has brought with it the rights and immunities which war to some extent modifies and restricts—among others, freedom of merchant vessels from search. The undoubted rule of international law at the present day is, that in time of peace the naval vessels of one nation have no right, except under treaty stipulations, to search or visit the vessels of another nation. The discussion of this question by the United States and Great Britain in 1858, resulted in so explicit an abandonment of the contrary doctrine, and every modification of it, by the only nation which strenuously upheld it, that it seems probable that the question will never come up again. But this state of facts and of law does not take away from any nation the right to seize its own vessels, under whatever concealments it may find them, nor give any other nation the right to object to such seizures. No nation undertakes to protect any vessel, except those belonging to its own citizens or subjects; procuring or retaining the documentation of any nation, by other persons, is fraudulent, and imposes no obligation of protection upon the government whose officers have been deceived, and whose flag has been illegally assumed, or illegally retained after transfer. The 18th section of the British merchant shipping act of 1854, declares that "no ship shall be deemed to be a British ship unless

she belongs wholly to owners of the following description: 1st. Natural born British subjects; 2d, persons made denizens, or legally naturalized; and, 3d, bodies corporate established under, subject to the laws of, and having their principal place of business in the United Kingdom or some British possession." Section 106 of the same act provides that "whenever it is declared by this act that a ship belonging to any person or body corporate, qualified according to this act to be owners of British ships, shall not be recognized as a British ship, such ship shall not be entitled to any benefits, privileges, advantages or protection. usually enjoyed by British ships, and shall not be entitled to use the British flag, or assume the British national character; but so far as regards the payment of dues, the liability to pains and penalties, and the punishment of offences committed on board such ship, or by any person belonging to her, such ship shall be dealt with in the same manner in all respects, as if she were a recognized British ship." Certainly if ships owned by British subjects may, in certain cases, not be "entitled to protection," the same may be safely predicted of all vessels owned by unqualified persons. The 103d section of the same act makes the acquiring of any interest as owner in a British ship by an "unqualified person," criminal, and forfeits the interest attempted to be acquired, to the crown. It is not necessary to refer to the shipping laws of other nations, upon a point so bald and undisputed.

In cases of such seizures as we are now considering, it is the duty of all parties to penetrate to the actual facts of the case. Though the right of search does not 'exist, still if a seizure is made in the belief that the facts exist to justify it, and it turns out that the vessel had no right to use the flag she was sailing under, that nation whose flag she had assumed is not injured nor insulted. The mode of proceeding may be other than distinctive prize proceedings, and the character and degree of proof different from the proof required in prize cases; but having reached the truth of the matter. the parties must all abide by the actual facts. The person intending to seize, weighs the proof in his possession and seizes at his peril; if he establish that the vessel had no right to the flag she wore. the question is a private one between himself and the seized vessel, under the laws before which the matter is adjudicated. In his note of April 10, 1858, addressed to the British minister at Washington, the secretary of state of the United States used this language: "A merchant vessel on the high seas is protected by her national character. He who forcibly enters her does so upon his own responsibility. Undoubtedly if a vessel assume a national character to which she is not entitled, and is sailing under false colors. she cannot be protected by this assumption of a national character to which she has no claim. As the identity of a

person must be determined by the officer bearing a process for his arrest, and determined at the risk of such officer, so must the national identity of a vessel be determined at the like hazard to him who, doubting the flag she displays, searches her to ascertain her true character. There no doubt may be circumstances which would go far to modify the complaints a nation would have a right to make for such violation of its sovereignty. If the boarding officer had just ground of suspicion and deported himself with propriety in the performance of his task, doing no injury, and peaceably retiring when satisfied of his error, no nation would make such an act the subject of serious reclamation." In the reply of Lord Malmesbury, the British secretary of state for foreign affairs, dated June 11, 1858, addressed to the British minister at Washington, he says: "Her majesty's government entirely agree in this view of the case, and the question therefore becomes one solely of discretion on the part of the acting officer." On the 26th of July, 1858, the Earl of Malmesbury announced in the house of lords, that on receiving the opinion of the law officers of the crown, her majesty's government had abandoned both the right of visit and of search. In supporting this action of the government, Lord Lyndhurst, in the debate which followed, made use of these words, which were listened to without dissent by the secretary for foreign affairs: "By our treaty with Spain we have, no doubt, the right to visit and search Spanish vessels, with the view to the suppression of the slave trade. But how can the treaty between Spain and us affect the rights of America? Why, common reason is decisive on the subject. Well, but what other course can we take? I say that the course is quite clear and plain. If one of our vessels sees a vessel with the American flag, and has reason to believe it is assumed, he must examine and inquire into the facts as well as he can. If he ascertain, to the best of his judgment, that the vessel has no right to use the American flag, he may certainly visit, and examine her papers, and if he finds his suspicions correct, he may deal with the vessel in a manner justified by the relation existing between England and that country to which the vessel belongs. America, in such a case, would have no right to interfere. The matter would simply be one between an English cruiser and the particular vessel seized." London Times, July 27, 1858. In the case of the "Marianna Flora," Justice Story, delivering the opinion of the supreme court of the United States, said: "It is true that it has been held in the courts of the United States, that American ships offending against our laws, and foreign ships, in like manner, offending within our jurisdiction, may afterwards be pursued and seized upon the ocean, and rightfully brought into our ports for adjudication. This, however, has never been supposed to draw after it any right of visitation and search. The party, in such cases, seizes at his peril; if he establishes the forfeiture he is justified; if he fails he must make full compensation in damages." [The Marianna Flora] 11 Wheat. [24 U. S.] 39. Sir Wm. Scott, in the case of the "Fortuna," used this often quoted language: "All that the court has thrown out respecting the effect of the flag and pass is this; that the party who takes the benefit of them is himself bound by them. He is not at liberty, when they happen to turn to his advantage, to turn around and deny the character which he has worn for his own benefit, and upon the credit of his own oaths or solemn declarations. But they do not bind other parties as against him. Other parties are at liberty to show that these are spurious credentials, assumed to disguise the real character of the vessel. And it is no inconsiderable part of the ordinary occupation of this court to pull off this mask, and exhibit the vessel so disguised in her true character of an enemy vessel. Now, looking upon the deposition and documents, I think that no doubt can be entertained that she is an American vessel, at present owned by Americans, and only colorably transferred to a Portuguese for the purpose of deception." But the "Fortuna" was a vessel captured indeed and libelled as prize, but captured under the Portuguese flag and condemned as an American vessel, (Great Britain being then at peace with both Portugal and the United States,) on the ground that she was engaged in the slave trade, which was permitted by Portugal, but prohibited by the United States. 1 Dod. 81. The "Donna Marianna" was seized under the Portuguese flag, while Great Britain was at peace with Portugal, for being engaged in the slave trade, and not as war prize. In delivering his judgment, Sir Wm. Scott said: "The first question is whether this court is at liberty to inquire into the title of this ship, which was at the time of capture navigating under the Portuguese flag, and has been claimed as Portuguese property. It is obvious to remark that if no such authority exists in this court, there must be an end of the operation of the act of parliament. It cannot be considered any hardship upon the subjects of those countries which still carry on the slave trade, that it should possess such a power. It can be no unconstitutional breach of the law of nations to require, that where a claim is offered on the ground that the property belongs to the subjects of a country which still permits this trade, the burden of giving proof of the property should lie upon those who set it up." The vessel was condemned as being really British owned. 1 Dod. 92.

The Diana was a Swedish vessel seized while Great Britain was at peace with Sweden, for being engaged in the slave trade. She was restored by the same great jurist, on the ground that Swedish laws permitted their vessels to engage in that trade; but in giving his opinion he said: "I see no reason

to suppose that there were any other than Swedish interests involved in this transaction," intimating plainly that if the proof had developed interest or ownership in the subjects of any state which prohibited the slave trade, he should have considered himself at liberty to go into that matter and condemn the property. 1 Dod. 95. The same judge held constantly that the slave trade is not piracy, nor a violation of the law of nations. Le Louis, 2 Dod. 248, 252; The Eagle, 1 W. Rob. Adm. 249; The Diana, 1 Dod. 95.

This vessel has been libelled as prize, and the testimony taken in the manner usual in prize cases. The evidence is, and could not fail to be in any form of proceeding, overwhelmingly conclusive of the fact that the vessel was lately "Confederate" property, and is so still, unless, on the present hypothesis, we say that the enemy organization within the United States, which commenced and waged the war, has wholly ceased to exist, and that so the war has come to an end; and in this view of the case the title to the vessel has passed not to any subject of the state whose flag was worn as a cloak and disguise, but to the nation which has conquered in war; and the seizure becomes strictly a seizure of one of our own vessels, with which other nations have no concern. "Complete conquest carries with it all the rights of the former government; or in other words the conqueror by the completion of his conquest, becomes, as it were, the heir and universal successor of the defunct or extinguished state." Hal. Law War, 839; and law of conquest generally. From another point of view it may be said, indeed, that as to the ultimate rights of the United States, Confederate property has all along been, before capture, simply the property of the United States, or of citizens of the United States. But assuming that the Confederate enemy organization was for a time entitled to be considered an independent power; if the government of the United States has overcome that power in war to such an extent that the war has entirely ceased, all the property of the extinguished state has certainly passed to the United States.

But though the court has paid some attention to this point it has done so rather from a desire to patiently examine every point suggested, than because of any seriously entertained opinion that it is entitled to much consideration. In the suppression of a great rebellion, or in the conquest of a state, it is more difficult to say with certainty when the state of war ceases, than it is when peace is declared or stipulations entered into on a particular day, by independent nations which have been at war. During the breaking down and disorganization of the enemy power, the state of war may cease in some respects, and continue in others. But whatever refinements of argument this point may be susceptible of under another state of facts, while the cruisers of the expiring rebellion are still recognized as in any respect entitled to the privileges and immunities of national vessels of war, it cannot be argued by the claimants of vessels captured on the ground of belonging to the rebel organization, that the state of war has ceased to exist; certainly not, as to vessels captured sailing under the flag of any of those nations which, at the date of capture, still continued this recognition. The proclamation of the president rescinding the blockade of all the ports, including by name that of Galveston, with which this vessel had been trading since she came out from Europe, is dated the 23d of June, ten days after this capture. By this proclamation an intention is indicated to use the army and navy to enforce the laws in a manner unusual in time of unqualified peace. He opens the ports to foreign trade after the first of July, but even then makes it unlawful to introduce certain articles, which he designates as "contraband of war." It is the opinion of the court that the property was properly libelled as prize.

The remaining question relates to the manner of the capture. The court sees nothing in this case to take it out of the usual rule as to captures made by noncommissioned captors. The main question cannot be affected by the manner of the capture. The captors may or may not be entitled to prize money if the property is condemned; that is a question between them and the government. They are liable to damages if the claimant proves the neutrality of the property and the legality of the voyage; but the onus still lies on the claimant to show this; and if he fail to do so, condemnation must follow. Was the property neutral? Was the voyage a lawful one? These are the questions to which the claimant must address himself. And unless he establish the affirmative as to both, or as to the first, which really includes the other, restitution must be denied. Enemy property can never be restored under any circumstances, unless it has been captured in violation of sacred obligations in the nature of truce. There is one English case of an enemy vessel directed by the prize court to be turned over to the crown, with an intimation that it ought to be delivered to the nation from which it had been captured. But this was because the capture had been made by prisoners, who had been placed on board a cartel ship by their own desire, to be returned home for exchange, and who were bound to do no hostile act while they occupied that position. The Mary, 5 C. Rob. Adm. 200.

Undoubtedly the practice of capturing vessels by revolt of crew, is one not at the present day to be advised or encouraged. There is, in attempts of this kind, a personal violation of faith; and the strife and bloodshed which naturally ensue, unless, as in this case, the attempt is immediately and completely successful, are of a kind which it is impossible not to distinguish from legitimate war-

fare; still there is very little in the history of the action of different governments on this point to discourage the practice. The British declaration in council of 1665–66, defining the rights of the lord high admiral of England in time of hostility, which is still in force, unless recently changed, declares, among other things, "that such ships as shall voluntarily come in, either men-of-war or merchantmen; upon revolt, from the enemy, shall belong unto his majesty," and not to the lord high admiral.

There are as many reasons why the crew of a vessel captured in the usual manner should not, after receiving a prize crew on board and starting for the port of adjudication, repossess the vessel by force, as there are why the crew of an enemy ship should not revolt and bring the vessel in in the first instance. Indeed there are more reasons on the score of humanity, for if the capturing commander doubts the captured crew, he can, before parting with his prize, take such measures as shall make recapture from within the ship an impossibility. Yet the crews of captured vessels ought to be kindly and not cruelly treated. These considerations have not, however, prevented both Great Britain and the United States, when neutral nations, from refusing to deliver up captured vessels, which have been recaptured by their crews and carried into their ports. 3 Am. St. Papers (Foreign Relations) p. 576; U. S. Dip. Cor. 1862, p. 111. Attempted recapture will, indeed, be accepted by prize courts as almost conclusive evidence against captured property; but this is because of the presumption it gives rise to, that the captured master uses force, because the facts of his case will not bear examination. Certainly no vessel captured by the enemy, and recaptured by her crew, was ever restored to the enemy by the nation to which she belonged because of wrongfulness of the revolt and recapture by the crew. Yet a demand of this would be as reasonable, and as operating to prevent cruelty, more reasonable than a demand of restitution, on the ground that the original capture from the enemy was by revolt.

The case of the "Dickenson," an American vessel seized during the Revolutionary War, decided in the English high court of admiralty, by Sir George Hay, was not dissimilar to the present one. In that case the crew revolted against the master, took possession of the ship, and carried her into an English port, where she stood in the same light that the "Wren" does here, that of a rebel-enemy vessel, except that there the national character of the property stood bare, and here it is very thinly disguised. The vessel and cargo were condemned as "lawful prize." 1 Hay & M. 2. A distinction has been taken at the bar between that case and the present one, on the ground that there the vessel was owned by enemies, and had come out of an enemy port, whereas here the vessel was sailing under a neutral flag, and between neutral ports. But it is as lawful to capture enemy vessels when in disguise, as when undisguised, and as lawful to capture them sailing between neutral ports as between enemy ports. Captors have the right to avail themselves of any ground of condemnation which the testimony may develop. The captors, in this case, have this right; still they seem to have acted on the conviction that the vessel was owned by enemies of the government. Now, though condemnations for violation of blockade, carrying contraband, &c., are loosely spoken of, yet, in point of ultimate analysis, all prize condemnations are on the basis of enemy property. The Elsebe, 5 C. Rob. Adm. 176. If the neutral owner show that he has so acted that he cannot be considered an enemy in the particular case, his property must be restored. So that all causes of condemnation merge in, and together only make up the one ground of enemy ownership. If the proof establishes such ownership, the inevitable consequence follows; it must follow if any known ground of condemnation is made out; but, under the circumstances, it is not improper to bear in mind that the captors seem to have based their action on the broadest possible ground of capture, and to have hastened to deliver the vessel into the hands of the authorities.

It is unnecessary to pursue this question further. The claimant has failed to establish the neutrality of the property, and restitution must be denied. If the vessel is ultimately condemned in the supreme court, the government and the seizors can dispute the question of prize money, if they choose to do so. The claimant has no status in court to present that question, and no interest in it. [The Amiable Isabella] 6 Wheat. [19 U. S.] 66; [The Dos Hermanos] 2 Wheat. [15 U. S.] 99; 1 C. Rob. Adm. 286, 303.

It ought to be added, that there is another important question, which has not been and could not be presented by the present claimant: Was this capture made in violation of the neutral territory of Spain?. It certainly was not completed within that territory, but the evidence is such as to make the question arguable, when properly presented. But captures made and completed in neutral waters are legal as between the belligerents. In such cases the claim ought to be by, and the restitution to, the nation whose sovereignty has been infringed. The Anne, 3 Wheat. [16 U. S.] 435; 3 C. Rob. Adm. 162; 6 C. Rob. Adm. 45; 1 Dod. 413. Any person properly authorized to raise this point, may move to have the decree opened.

A decree of condemnation follows:

[The case was appealed to the supreme court, where the decree was reversed, and the vessel restored, but without costs. 6 Wall. (73 U. S.) 582.]